The <u>Sixth Amendment</u> as <u>defined by</u> the <u>Supreme Court</u> has previously ruled that, "other than the fact of a prior conviction any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a resonable doubt." <u>Apprendi</u> at 690. In <u>Blakely</u>, the Supreme Court ruled, 'over pointed dissents' that, "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentance a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." <u>Blakley</u>, <u>supra</u>, at *4. "in other words, the relevant ' statutory maximum' <u>is not</u> the maximum sentence a judge may impose after finding additional facts, but the maximum he May impose without additional findings". When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority." Id" (citation omitted).

> NOTE: As is well precedented in <u>all</u> courts, that a jury can <u>only</u> return a verdict <u>on</u> the elements/factors that are explicitedly cited in the indictment. For the verdict to be based on any element/factor more or any element/factor less is plain constructive amendment to the indictment itself. This would violate the Due Process Clause of the Fifth Amendment along with the Fair Notice 'sub-clause of the indictment clause". So a jury <u>can</u> <u>not</u> return a verdict based on elements/factors that are not explicitedly cited in the indictment. Also a <u>defendant in a guilty plea</u>, even <u>if he admits</u> <u>elements/factors not in the indictment</u>, he/she <u>can not be found</u> by the <u>court/trier/fact-finder</u> to have committed those <u>acts and punished for</u> them".

31C.   The <u>Blakely</u> Court addressed just this type of issue in that guilty plea case. Where the Court held that "Those who would reject <u>Apprendi</u> are resigned to one of two alternatives. The first is that the jury need only find whatever facts the legislature

[34]

chose to label as elements of a crime, and that those it labels sentencing factors--no matter how much they may increase the punishment--may be found by the judge. This would mean, for example, that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it--of of making an illegal lane change while fleeing the death scene. Not even <u>Apprendi's</u> critics would advocate this absurd result. Cf. 530., at 552-553 (O'Connor J.)

31D. <u>Honorable William Young, Chief U.S. District Judge of Massachusetts</u>, where he states in his 173 page opinon in <u>United States v. Green</u>, Crim No. 02-10054 (June 18, 2004):

> "Any explanation of how <u>Apprendi</u> and <u>Ring</u> apply to the Guidelines must begin with an understanding of earlier case law.

31E. After <u>Apprendi</u>, the Second Circuit Court of Appeals, in an en banc decision, released the much anticipated case of <u>United States v. Thomas,</u> 274 F.3d 655 (2nd Cir. 2001), it was held that drug quantity, under the statutory scheme of title 21 U.S.C. § 841(b)(1) is an element of the offense, which must be charged in the indictment and submitted to the jury for proof beyond a reasonable doubt.

31F. The <u>Thomas</u> court held that to <u>charge a defendant</u> with violation of <u>21 U.S.C. § 841, without</u> reference to <u>drug type or quantity</u>, then the sentencing of a defendant to a sentence within §§ 841(b)(1)(B) or (b)(1)(A) amounted to <u>contructive amendment</u> of the <u>indictment</u> which is <u>per-se error</u>. The Court further held that under either view, (<u>trial error sentencing error</u>) the defendant's "<u>substantial rights</u>" were adversely affected by the inconsistency

[35]

between the crime charged and that proved to the jury. Finally the court held that this plain error affected the fairness of the proceeding, because the error might have discouraged trial counsel from vigorously cross-examing the government's witness at trial regarding drug quantity. The court found that this error would seriously affect the public reputation of judicial proceedings, whether view as an error in sentencing, or an error in the conviction, if the sentence were allow to stand. Thomas did overrule the much daunted case of United States v. Tran, 234 F.3d 798 (2nd Cir. 2000), as to whether some jurisdictional defects are subject to plain error standard. This shows that my trial counsel could have more vigorously cross-examined a prosecution witness as to the drug quantity, like I had asked him to do. This met's the forth prong of Olano, and also under Blakely/Apprendi type errors.

31G. Also, the U.S. Court of Appeals for the Fifth Circuit previously held that an Apprendi error involving the failure to charge drug quantity in the indictment and submit it to the jury for proof beyond a resonable doubt is a jurisdictional defect. See United States v. Gonzales, 259 F.3d 355, 360 (5th Cir. 2001). See also United States v. Baptiste, 264 F.3d 578, 593 (5th Cir. 2001).

31H. Jurisdiction can be raised at anytime and addressed by Federal Courts at anytime on their own motion. See McGrath v. Krislensen, 340 U.S. 162 (1950). Jurisdiction cannot be waived and cannot be conferred upon a Federal District Court by consent, inaction or stipulation. See California v La Rue., 409 U.S. 109,

112, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972).

31I. In both the Gonzales and Baptiste cases the government failed to charge drug quantity in the indictment or submit it to the jury for proof beyond a resonable doubt. The court held that such a failure, is jurisdictional in nature and therefore evidence adduced at trial supporting drug quantity or even stipulations as to drug quantity made by the defendant, are not relevant to the analysis of a claim of such failure. In other words the court, in the case of a trial, cannot look to what drug amount, leadership role, monetary amount, etc..., (anything that amounts to an enhancement from "Base Offense Level") was claimed to have been involved, by the govenment witness in reviewing a claim under Blakely/Apprendi. Nor can a court, in a guilty plea, use the defendant's admission as to drug quantity, monetary amounts, leadership role, etc..., (anything that amounts to an enhancement from the Base Offense Level"), that is not alleged in the indictment.

31J. In re Winship, 397 U.S. 358 (1970), where the Supreme Court held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Id. at 364 as the Supreme Court explained: "The [reasonable doubt] standard provides concrete substance for the presumption of innocence-- that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." Id. at 363 (quoting Coffin v. United States, 156 U.S.

[57]

432, 453 (1895) (internal quotation marks omitted). By reducing the risk that an individual will be convicted in error, use of the resonable doubt standard serves three ends of surpassing importance. First, it protects individuals from unjustified deprivation of their liberty and imposition of the stigma that attaches to criminal convictions. See Id. at 363-64. Second, it "is indispensable to command the respect and confidence of the community in application of the criminal law." Id. at 364. Third it ensures that "every individual going about his ordinary affairs ha[s[ confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." Id.

31K. Since then, the Supreme Court has provided further clarification as to what constitutes a "fact necessary to constitute the crime with which [an individual] is charged." Id. The first important divide is between facts that constitute elements of a crime, which the government must prove beyond a reasonable doubt and facts that constitute a defense to a crime, which legislature can require a defendant to prove, typically by a preponderance of the evidence. The Supreme Court's divergent reponses to two similar statutory regimes for murder prosecution demonstrate the principles that inform this inquiry.

31L. Under the Main approach that the Supreme Court invalidated in Mullaney v. Wilbur, 421 U.S. 684 (1975), the law recognized two types of homicide -- Manslaughter and murder. Mullaney, 421 U.S. 685-86 & nn. 1-3. Both required the killing in question to be unlawful and intential, but only the latter required the additional

[58]

element of malice aforethought. <u>Id.</u> Once the government proved beyond a reasonable doubt that a killing was unlawful and intentional, however, malice aforethought was to be conclusively presumed unless the defendant proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation. <u>Id.</u> at 686-87 & nn. 5-6. The <u>Supreme Court adopted Maine's highest court's interpretation of Maine Law</u>, wherein murder and manslaughter were punishment categories for a single crime of "felonious homicide." <u>Id</u> at 689-91. The Supreme Court then explained that Maine Law "is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpability," <u>Id.</u> at 697-98., and pointed out that "if <u>Winship</u> were limited to those facts that constitute a crime as defined by state law, a state could undermine many of the interest that decision sought to protect. . . [by] redefin[ing] the elements that constitute different crimes, and characterizing them as factors that bear solely on the extent of punishment." <u>Id.</u> at 698. Because "<u>Winship</u> is concerned with substance rather than this kind of formalism[,]. . . [and] requires an analysis that looks to the operation and effect of the law as applied and enforced by the state, and to the interest of both the State and the defendant as affected by the allocation of the burden of proof," <u>Id.</u> at 699 (quoting St <u>Louis Southwestern Ry. Co v. Arkansas,</u> 235 U.S. 350, 362 (1914)) (internal quotation marks omitted), the <u>Supreme Court</u> held that under Maine's system, the absence of heat of passion upon sudden provocation would have to be proved by the government beyond a reasonable doubt. <u>Id.</u> at 704.

31M. It is difficult to see any practical difference between the statutes in Mullaney and Patterson, so it seems that read together, they place few substantive limits on the power of legislatures to define "fact[s] necessary to constitute the crime with which [an individual] is charged," Winship, 397 U.S. at 364, at least determine as between "elements" and "defenses."

Note: The Unconstitutionality of Determinate Sentencing in light of the Supreme Court's "Elements" Jurisprudence, 117 Harv. L. Rev. 1236, 1238 (2004) [hereinafter Unconstitutionality of Determinate Sentencing].

31N. Essentially, under these two cases courts will first determine whether, under the terms set by a state's law, the legislature has complied with Winship. If the state passes the test, then the court will determine, guided by history, tradition and the common law, as well as some consideration of practical consequences, whether the state has gone too far" in arranging its criminal law to evade Winship. The Supreme Court has set down per se rules to enforce Winship's protections where it can and has otherwise fallen back on vaguer standards that permit greater legislative latitude. The division between "elements" and "defenses" falls into this latter category.

31O. In McMillian v. Pennsylvania, 477 U.S. 79 (1986), the Supreme Court, "for the first time, coined the term "sentencing factor'to refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge. Apprendi, 530 U.S. at 485. In McMillan, the Supreme Court upheld a Pennsylvania law that required imposition of a mandatory minimum sentence of five years if a sentencing judge found by a preponderance of the evidence that an individual convicted of one of certain enumerated felonies has "visibly poss-

"possessed a firearm" while committing the offense.[201] In no case would this minimum sentence exceed the maximum sentence provided for the enumerated felonies.[202] The Supreme Court articulated and applied "a multifactor set of criteria for determining whether the Winship protections applied to bar such a system,"[203] emphasizing that constitutional limits existed on States' ability to evade Winship by defining "true" elements as sentencing factors.[204] Specifically, the Supreme Court noted that "[t]he statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive [criminal] offense," and that the petitioners would have a stronger argument if the finding "exposed them to greater or additional punishment."[205] Having upheld the statute, the Supreme Court established that, unlike an element, a sentencing factor need not be proved beyond a reasonable doubt, and unlike

---

[201] McMillan, 477 U.S. at 81.

[202] Id. at 81-82.

[203] Apprendi, 530 U.S. at 486 (citing McMillan, 477 U.S. at 86-88).

[204] McMillan, 477 U.S. at 85-88.

[205] Id. at 88.

72

an element or a defense, it need not be proved to a jury. The Supreme Court has since employed McMillan's approach on several occasions to determine whether a particular fact should be treated as an element or a sentencing factor.[206]

As with the division between "elements" and "defenses," the Supreme Court chose to rely on a permissive and somewhat vague standard in ensuring that use of sentencing factors to limit the lower end of statutorily prescribed sentencing ranges complies with Winship. McMillan left open the possibility, however, that a different sort of rule might govern situations where sentencing factors affected the upper end of sentencing ranges.

### 2. Apprendi and Its Progeny

In the landmark case of Apprendi v. New Jersey, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[207] The Court considered this a consequence

---

[206] See Harris v. United States, 536 U.S. 545, 552-56 (2002); Jones v. United States, 526 U.S. 227, 232-52 (1999); Almendarez-Torres v. United States, 523 U.S. 224, 228-47 (1998).

[207] 530 U.S. at 490. The Supreme Court explained the exception for the fact of prior conviction partly as a concession to stare decisis, and partly under a more principled rationale. See Apprendi, 530 U.S. at 488-90. The exception preserved the Supreme Court's holding in Almendarez-Torres, 523 U.S. at 227, that a sentencing judge could, based on the fact of prior conviction, impose a sentence higher than the statutory maximum for the offense stated in the indictment. Apprendi, 530 U.S. at 489-90. The Supreme Court noted that "it is arguable that Almendarez-Torres was wrongly decided," id. at 489, but declined

73

of the Due Process Clause of the Fourteenth Amendment, which prohibits any deprivation of liberty without due process of law, and of the Sixth Amendment, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."[208]

Apprendi dealt with a New Jersey law that permitted a sentencing judge to enhance a convicted criminal's sentence upon a finding by a preponderance of the evidence that the offense was committed with a racially biased purpose.[209] Apprendi had been convicted of two second-degree felonies, each of which had a sentencing range of five to ten years, and a third-degree felony which carried a three-to-five-year sentence that would run concurrently with the other two.[210] The trial judge found racial bias, and therefore imposed a twelve-year sentence on one of the second-degree felony counts.[211] Thus, for that sentence, the

---

to revisit it, id. at 490, emphasizing that any prior conviction would have been procured subject to the procedural safeguards of criminal proceedings, id. at 488. In the wake of Apprendi, in fact, all the facts necessary to produce a conviction will have to be proved to a jury beyond a reasonable doubt, unless the defendant waives his rights, so the "exception" is not really an exception at all.

[208] See id. at 476-77, 490.

[209] Id. at 469-70.

[210] Id. at 470.

[211] Id. at 471.

74

provided by § 13-703."[215] Under the cross-referenced provision, once a jury found a defendant guilty of first-degree murder, the judge would hold a hearing and determine the presence or absence of enumerated aggravating and mitigating circumstances.[216] Only the judge would make this determination, and in order to impose the death penalty, the judge had to find beyond a reasonable doubt that at least one aggravating factor existed, with "no mitigating circumstances sufficiently substantial to call for leniency."[217] As the Supreme Court described this regime, "Ring could not be sentenced to death, <u>the statutory maximum penalty</u> for first-degree murder, unless further findings were made."[218]

The Supreme Court held that Arizona's death penalty regime violated the rule announced in <u>Apprendi</u>.[219] Recalling <u>Apprendi</u>'s admonition that the inquiry was "one not of form, but of effect," the Supreme Court stated the following rule: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no matter how the State labels it

---

[215] <u>Ring</u>, 536 U.S. at 592 (quoting Ariz. Rev. Stat. Ann. § 13-1105(C) (West 2001)) (internal quotation marks omitted).

[216] <u>Id.</u> at 592.

[217] <u>Id.</u> at 592-93, 597 (quoting Ariz. Rev. Stat. Ann. § 13-703(F) (West 2001), and citing <u>Ring</u>, 200 Ariz. 267, 279 (2001)) (internal quotation marks omitted).

[218] <u>Id.</u> at 592 (emphasis added).

[219] In the process, the Supreme Court overruled <u>Walton v. Arizona</u>, 497 U.S. 639, 647-49 (1990). <u>Ring</u>, 536 U.S. at 609.

76

-- must be found by a jury beyond a reasonable doubt."[220] It also emphasized that its holding did not rest on the heightened protections that the Constitution affords in death penalty cases; rather, the point was that capital defendants should have the same protections that the Apprendi rule affords to all defendants.[221]

In Harris v. United States,[222] decided the same day as Ring, the Supreme Court confirmed the continuing viability of McMillan by upholding a statute that imposed a mandatory minimum sentence, below the prescribed statutory maximum, upon a sentencing judge's finding by a preponderance of the evidence that a particular sentencing factor was present.[223] Justice Thomas, joined by three other members of the Apprendi majority -- Justices Stevens, Souter, and Ginsburg -- dissented, arguing that any fact the

---

[220] Ring, 536 U.S. at 602.

[221] Id. at 606-07. Justice Breyer's concurrence did rely on the special nature of capital cases, and it expressed his continuing belief that Apprendi should be overruled, but his vote was not necessary to form a majority in Ring. Ring, 536 U.S. at 613-14 (Breyer, J., concurring in the judgment). All five members of the Apprendi majority joined the majority opinion in Ring. Justice Scalia, joined by Justice Thomas, wrote a concurring opinion to note his continuing skepticism about the Supreme Court's death penalty jurisprudence, but both Justices joined the majority opinion in full. See id. at 610-12 (Scalia, J., concurring). Justice Kennedy's concurrence provides a seventh vote: despite his misgivings about Apprendi, he felt the rule should apply to capital defendants as well. See id. at 613 (Kennedy, J., concurring).

[222] 536 U.S. 545 (2002).

[223] Harris, 536 U.S. at 552.

77

proof of which increases the maximum <u>or minimum</u> punishment must be proved to a jury beyond a reasonable doubt.[224]

Justice Scalia, the fifth member of the <u>Apprendi</u> majority, "switched sides" in <u>Harris</u>, and, although he did not articulate his reasons for doing so at that time, the concurring opinions in <u>Apprendi</u> and <u>Ring</u> show why. In Justice Scalia's <u>Apprendi</u> concurrence, he states that the right to jury trial "has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment <u>must</u> be found by the jury."[225] The point is that "the criminal will never get <u>more</u> punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which he is exposed) will be determined <u>beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens</u>."[226] Under Justice Scalia's approach, the "sentence to which [a defendant] is exposed" is the maximum permissible sentence under the law, not the likely sentence that he would receive.[227]

Moreover, Justice Scalia joined Parts I and II of Justice Thomas's <u>Apprendi</u> concurrence, which argued that "the original

---

[224] <u>Id.</u> at 574-77 (Thomas, J., dissenting).

[225] <u>Apprendi</u>, 530 U.S. at 499 (Scalia, J., concurring).

[226] <u>Id.</u> at 498.

[227] <u>See id.</u>

78

understanding of which facts are elements was even broader than the rule that the Court adopts today," and established "that a 'crime' includes every fact that is by law a basis for imposing or increasing punishment."[228] Justice Scalia did not, however, join Part III of Justice Thomas's concurrence, which urged overruling of McMillan, because "the fact triggering the mandatory minimum is part of 'the punishment sought to be inflicted.'"[229] In other words, Justice Scalia agreed that any fact that in practice increases the maximum punishment (without reference to any "statutory maximum") must be proved to a jury beyond a reasonable doubt, but disagreed that the same should be true of a fact that merely raises the minimum punishment.[230]

---

[228] Id. at 501 (Thomas, J., concurring); see also id. at 506, 512, 518.

[229] Id. at 522 (quoting 1 J. Bishop, Law of Criminal Procedure 50 (2d ed. 1872)).

[230] See also Ring, 536 U.S. at 610 (Scalia, J., concurring, joined by Thomas, J.). In a sense, Justice Thomas's approach focuses more on the individual's settled expectations, whereas Justice Scalia's approach focuses more on state power, although both use the language of contract. In Justice Thomas's view, allowing a sentencing factor to impose a mandatory minimum sentence, without impacting the maximum available sentence, changes the value of the criminal defendant's expectation, because the likely sentence is greater, even if the maximum sentence has not changed. Under Justice Scalia's approach, all that matters is how much power proof of certain facts gives the state over an individual. Beneath the maximum available punishment, it is a matter of relative indifference to Justice Scalia to what extent a legislature permits a lenient judge, executive, or parole board to impose a lesser punishment; what matters is the defendant's vulnerability to infringement on his liberty. See Apprendi, 530 U.S. at 498 (Scalia, J., concurring).

likelihood increases due to the ever increasing disrepute of the entire Guidelines structure in the eyes of the judiciary.[68]

### 7. Ignoring the Guidelines -- Fraudulently

The most repugnant of the Department's tactics is to lie to the Court in order to induce a guilty plea. This is the process known as "fact bargaining." It occurs when a departmental attorney "swallows the drugs" or "the gun" as the case may be, i.e., fails to report to the probation officer in rendering its descriptions of offense conduct (and then later fails to bring to the attention of the Court) relevant evidence that may affect the

---

[68] See, e.g., Decisions: United States v. Steven Kim, N.Y.L.J., Oct. 24, 2003, at 17 ("[Judge Patterson] denounced Congress' toughening of the federal sentencing guidelines . . . ."); Frank O. Bowman, III, When Sentences Don't Make Sense, Wash. Post, Aug. 15, 2003, at A27 (noting Justice Anthony Kennedy's statement to the American Bar Association that federal sentences are harsher and the Guidelines are less flexible than they should be); Dan Herbeck & Gene Warner, Battle on the Bench: Federal Judges Around the Nation -- Including John T. Elfvin Here -- Are Battling John D. Ashcroft's Justice Department, Buffalo News, Feb. 20, 2004, at A1 (discussing widespread judicial opposition to the Guidelines); Judge John S. Martin, Jr., Let Judges Do Their Jobs, N.Y. Times, June 24, 2003, at A31 (explaining that he was retiring because he could no longer in good conscience sentence under the Guidelines regime); Ian Urbina, New York's Federal Judges Protest Sentencing Procedures, N.Y. Times, Dec. 8, 2003, at B1 (describing public criticism of the Guidelines by New York district judges and by Minnesota Chief District Judge James Rosenbaum); Alan Vinegrad, The Judiciary's Response to the PROTECT Act, N.Y.L.J., Jan. 8, 2004, at 4 (noting criticism by Justices Anthony Kennedy and Stephen Breyer of increasing use of mandatory minimum sentencing); Edward Walsh & Dan Eggen, Ashcroft Orders Tally of Lighter Sentences: Critics Say He Wants "Blacklist" of Judges, Wash. Post, Aug. 7, 2003, at A1 (noting Eighth Circuit Judge Myron H. Bright's statement in a concurring opinion that recent changes to the Sentencing Guidelines "will exacerbate the problems with the guidelines").

guidelines calculation in order to reduce that calculation to secure a disposition to which it and defense counsel have agreed.

This, of course, is flat-out illegal,[69] and Attorney General Ashcroft has prohibited it in no uncertain terms. This Court is unaware of any instance where the Attorney General has disciplined a Department attorney for engaging in the practice.

As the practice constitutes a direct fraud on the Court, it is difficult to uncover. Fact bargaining drove the disparate sentences in United States v. Rodriquez,[70] but the First Circuit accepted the Department's all too facile explanation and failed to explore the issue.[71] Again, charge bargaining coupled with prohibited fact bargaining drove the cruelly disparate sentences in United States v. Thurston,[72] but the Court of Appeals again

---

[69] See U.S.S.G. § 1B1.3(a) (making it clear that all "relevant conduct" must be considered during sentencing); id. § 1B1.8 n.1 (noting that the provision, which places limits on the use of self-incriminating information that the defendant provides as part of an agreement to cooperate with the government, "does not authorize the government to withhold information from the court"); id. § 6B1.4(a)(2) & cmt. ("[W]hen a plea agreement includes a stipulation of fact, the stipulation must fully and accurately disclose all factors relevant to the determination of sentence. . . . [I]t is not appropriate for the parties to stipulate to misleading of non-existent facts . . . ."). See also Berthoff, 140 F. Supp. 2d at 61-67 & nn.18-30 (discussing the prevalence and illegality of fact bargaining).

[70] 162 F.3d 135 (1st Cir. 1998), cert. denied, 526 U.S. 1152 (1999).

[71] Berthoff, 140 F. Supp. 2d at 64-66.

[72] 358 F.3d 51 (1st Cir. 2004).

failed to detect it,[73] focusing instead on the perceived inadequacies in the district court's sentencing rationale.[74]

This Court has burdened an already strained probation office by ordering pre-plea pre-sentence reports in virtually every case as the best defense to illegal fact bargaining. The effort has borne fruit; William Olivero and Jason Pacheco, whose cases are discussed below, were potential victims of illegal fact bargaining.

All of these techniques, both legal and illegal, further the Department's goal: securing plea bargains in the overwhelming number of cases in order to enforce the law at the cheapest possible cost and avoid the risks of having to expose the Department's investigations to the neutral review of judges and juries. That these techniques are eviscerating the Sixth Amendment's guarantee of a jury of the people seems rarely to occur to those who practice them and, if it does, it hardly seems important.

---

[73] See Berthoff, 140 F. Supp. 2d at 64-66; see also supra note 26.

[74] See Berthoff, 140 F. Supp. 2d at 64-66; see also supra note 26.